ANALYTICHEM INTERNATIONAL, INC. and California Institute Research Foundation, Plaintiffs,

v.

HAR–LEN ASSOCIATES, INC., Defendant.

Civ. A. No. 79–1709 Q.

United States District Court, W. D. Pennsylvania.

May 20, 1980.

---

Stanley J. Price, Jr., Pittsburgh, Pa., Norman Zafman, Blakely, Sokoloff, Taylor & Zafman, Beverly Hills, Cal., for plaintiffs.

Robert D. Yeager, Pittsburgh, Pa., for defendant.

## OPINION

DUMBAULD, Senior District Judge.

Before us for disposition are two motions unconnected with the validity of the patent involved in the case or its infringement: (1) motion by plaintiff * to strike under Rule 12(f) FRCP as an "insufficient defense" defendant's first affirmative defense (unclean hands); and (2) motion by defendant under Rule 56 FRCP for summary judgment upon the ground of patent misuse.

Apparently it is not disputed that plaintiff's motion is untimely under Rule 12(f), but we shall examine the merits of whether it should be granted because the proffered affirmative defense is "insufficient."

It frequently happens in a capitalistic and competitive economy that manufacturers of a product may wish to change their system of distribution from time to time, and are free to do so unless some violation of the rights of other parties is demonstrated. In the case of automobile dealers, for example, statutory rights against inequitable termi-

---

* For convenience we speak of plaintiff, meaning Analytichem International, Inc., the exclusive licensee and active exploiter of the patent involved herein, of which California Institute Research Foundation is the assignee from the original patentee.

nation have been afforded by Congress. 15 U.S.C. § 1222. A producer may engage in predatory competition with its own customers [see *Mt. Lebanon Motors, Inc. v. Chrysler Corp.*, 283 F.Supp. 453, 457 (W.D.Pa. 1968), aff'd 417 F.2d 622 (C.A. 3, 1969)], or extend the area of its own direct sales agencies into territories theretofore developed by distributors who are eliminated when the direct penetration of the territory takes place [see *U. S. v. Klearfax Linen Looms*, 63 F.Supp. 32, 38–39 (D.Minn.1945)].

■ *A priori* it would seem that in the normal course of business California Institute Research Foundation would be free to substitute one exclusive licensee for another as distributor under its patent. Especially if Manhatten Instruments was a failing business, it would seem legitimate to seek to substitute a more solvent distributor. But defendant alleges a manipulative conspiracy to effect substitution of plaintiff Analytichem for Manhatten, as a means of interfering with defendant's advantageous relationship with Manhatten, for the purpose of eliminating defendant as a competitor. This could constitute tortious conduct (see Restatement, Torts § 766B) to the detriment of defendant's sales of the product covered by the terms of the patent involved in the case at bar. A situation similar to that in *Federal Folding Wall Corp. v. National Folding Wall Corp.*, 340 F.Supp. 141, 143 (S.D.N.Y.1971), might possibly be demonstrated, so that a case of "unclean hands" might be established as a defense. That is a defense available in a patent infringement suit. *Keystone Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct. 146, 147, 78 L.Ed. 293 (1933); *De-Raef Corp. v. Horner Sales Corp.*, 10 F.R.D. 28 (W.D.Pa.1950).

It would seem premature to hold at the present stage of the case that as a matter of law the clean hands issue raises nothing but an "insufficient defense." While it seems *a priori* improbable that a company would wish to go out of business itself merely to put its distributor out of business, defendant should be afforded the opportunity to establish the unclean hands defense by appropriate [1] discovery if possible.

After all, as an eminent jurist writes of the Federal Rules of Civil Procedure: "Today they permit a litigant who suspects he has a good case as either plaintiff or defendant to file a complaint or an answer without knowing whether the allegations are true or not, and then use the process of discovery to find out if he is right." [2]

Hence plaintiff's motion to strike shall be denied.

■ With respect to defendant's motion for summary judgment, we begin by noting that to a certain extent there may be overlap between "unclean hands" and "misuse of a patent." The latter is often said to be an outgrowth of the former, but it relates specifically to an attempted unwarranted extension of the economic benefits derivable from the legitimate monopoly conferred by a valid patent. *Morton Salt Co. v. Suppiger Co.*, 314 U.S. 488, 492–94, 62 S.Ct. 402, 405–406, 86 L.Ed. 363 (1942); *Mercoid Corp. v. Mid-Continent Co.*, 320 U.S. 661, 670, 64 S.Ct. 268, 273, 88 L.Ed. 376 (1944).

■ While the most common mode of attempting to extend the impact of a patent beyond its proper scope is by means of a tying clause requiring use of unpatented articles as a condition of using the patented article,[3] misuse of a patent can occur in other ways.

---

1. We emphasize that burdensome and dilatory discovery should be discouraged. The bar is beginning to realize that discovery is not necessarily a wholesome reform but may be turning into an expensive Frankenstein favoring "deep pocket" litigants and denying access to justice to those less munificently endowed. See comments of Chief Justice Warren Burger, "Annual Report on the State of the Judiciary—1980." 66 A.B.A.J. 295, 296 (March, 1980).

2. Thurman W. Arnold, *Fair Fights and Foul* (1965) 266.

3. A good example is *International Business Machines Corp. v. U. S.*, 298 U.S. 131, 137–38, 56 S.Ct. 701, 704, 80 L.Ed.2d 1085 (1936), where IBM sought to prohibit use of its tabulating machines to process cards manufactured by others. Razors and blades, cameras and film, typewriters and paper, pen and ink would be further illustrations. Cf. *U. S. v. Jerrold Electronics Corp.*, 187 F.Supp. 545, 557 (E.D.Pa.

■ The basic vice is the attempt to extend the granted monopoly beyond the terms of the grant. As stated in *Morton Salt, supra*, 314 U.S. at 491, 62 S.Ct. at 404: "It . . . appears that respondent is making use of its patent monopoly to restrain competition in the marketing of unpatented articles, salt tablets, for use with the patented machines, and is aiding in the creation of a limited monopoly in the tablets not within that granted by the patent. A patent operates to create and grant to the patentee an exclusive right to make, use and vend the particular device described and claimed in the patent. But a patent affords no immunity for a monopoly not within the grant . . . and the use of it to suppress competition in the sale of an unpatented article may deprive the patentee of the aid of a court of equity to restrain an alleged infringement by one who is a competitor."

In the same case the Court said (at 493, 62 S.Ct. at 405): "Maintenance and enlargement of the attempted monopoly of the unpatented article are dependent to some extent upon *persuading the public of the validity of the patent*, which the infringement suit is intended to establish. Equity may rightly withhold its assistance from such a use of the patent by declining to entertain a suit for infringement, and should do so at least until it is made to appear that the improper practice has been abandoned and that the consequences of the misuse of the patent have been dissipated." [Italics supplied].

In the case at bar the letters sent during the period December 14–19, 1979, by plaintiff to customers of defendant [Ex. 7 to App. to defendant's motion] clearly show plaintiff's intention of "persuading the public of the validity of the patent." The letter sent asserts that use of defendant's product "infringes certain methods claimed in the subject patent." The letter proceeds to state categorically that "if you are using [defendant's product], such use would constitute infringement of the exclusive patent rights which belong to [plaintiff]."

The letter further states that its purpose is to place the recipient on notice in the event that defendant's customer has "heretofore been unaware that your use of [defendant's product] constitutes patent infringement."

Reciting the institution of the instant litigation[4] the letter continues: "If you wish to preclude our instituting an infringement action against you, you must promptly notify the undersigned in writing either that (i) you are not using and have never used [defendant's product]; or (ii) if you are using the same, you agree to cease and desist further use thereof." In the latter case an accounting is demanded of the number of defendant's JETUBE columns that have been purchased from defendant. The recipient is exhorted that "Your compliance with the foregoing demand will not only avoid your involvement in the litigation, but will eliminate your exposure to a claim for monetary damages for past and continuing infringement." Lastly, a plug for plaintiff's product as a suggested substitute assures "the highest quality . . . at a fair market price." The letter closes with a declaration that it is "without prejudice to any claim for damages or other relief in the event litigation against you ensues."

This letter, sent to innocent third party customers of defendant, is clearly a forceful effort to persuade them that they are infringing a valid patent and will face serious consequences unless they divert their trade from plaintiff's product to defendant's. It constitutes (to borrow a term from another field of law) jactitation of a patent.[5]

1960), aff'd 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961), where the tie-in was permitted in connection with a new business with an uncertain future. The business proved successful, and Milton J. Shapp its founder later was twice elected Governor of Pennsylvania.

4. Sufficiently identified by *idem sonans*, though the place of holding court is spelled "Pittsburg."

5. The dictionary definition of jactitation is "false boasting or assertions repeated to another's prejudice; false claim." The usual instance is *jactitation of marriage*: "A false giv-

If no patent right exists or is infringed, surely both defendant and its customers are wronged by the deceitful claim. The affidavits filed on behalf of plaintiff show that plaintiff knew of the reservation for the benefit of public agencies, but inadvertently or improvidently forgot to make disclosure of that feature of the patent license in the letter. Plaintiff must bear the responsibility for its own alleged absent-mindedness.

■ In essence abuse of a patent consists of seeking economic gain by persuading or coercing the purchasing public to believe that a patent right exists when in fact and in truth it does not. The situation is akin to a private individual, like the legendary Captain from Kopenick, pretending to be a tax collector authorized by law to exact tribute when in fact he is an impostor without authority.

■ Plaintiff's conduct as manifested in the above-quoted letter clearly comes within the condemned course of conduct. The definite impression is given to the purchaser that a valid patent right exists and will be asserted by lengthy, burdensome, and expensive litigation if the customer does not transfer his purchases from defendant to plaintiff.

No disclosure is made that the patent right is really inapplicable to customers of the type to whom the letter was sent. Plaintiff's conduct resembles that of an oil company selling "old oil" as "new oil" for a higher price.

Nevertheless, here too at the present stage of the case it would be premature to enter final judgment of dismissal against plaintiff. The above-quoted passage from *Morton Salt* (314 U.S. at 493, 62 S.Ct. at 405) indicates the possibility of "purging" an abuse of a patent by desisting from the wrongful claim and dissipating the consequences of the misuse.

Plaintiff has already sent a letter of April 15, 1980, (Ex. 2 to Plf's notice of opposition) to certain recipients of the December 13–19, 1979, letters indicating that an organization covered by the reservation in favor of public agencies (paragraph 3 of the April 10, 1973 Instrument of Waiver, Ex. 4 of Deft's App. to Motion) "could not be an infringer of the subject patent."

Further development of the record might show what impact the first letter had had, what volume of purchases from defendant had been deterred or diverted thereby, what royalties had been collected on purchases from plaintiff by exempt customers, whether such royalties had been promptly refunded as required by the terms of the Instrument of Waiver, what impact the letter of April 15, 1980, had had (whether it had as little effect as the usual retraction on page 10 of a newspaper of a scandalous statement in front page headlines, or whether the recipients of both the 1979 and 1980 letters were represented by skilled patent counsel and the rights of all parties were at all times clearly understood), and any other relevant circumstances relative to establishment of the dissipation *vel non* of the patent abuse.

As a result of a showing favorable to plaintiff on this issue plaintiff might be in a position to prosecute the instant litigation on its merits.

Hence defendant's motion for summary judgment shall be denied.

Counsel are urged to proceed promptly with such further steps as are needed to enable this litigation to be disposed of without delay.

ing out or boasting by a party that he or she is married to another, whereby a common reputation of their matrimony may ensue."