**SHOP & SAVE FOOD MARKETS, INC., Plaintiff-Appellant,**

v.

**PNEUMO CORPORATION, Abbott Realty Company, and P & C Food Markets, Inc., Defendants-Appellees.**

**No. 20, Docket 80–9053.**

United States Court of Appeals, Second Circuit.

Argued Oct. 9, 1981.

Decided Jan. 20, 1982.

On Rehearing July 2, 1982.

---

John L. Primmer, St. Johnsbury, Vt., Robert D. Rachlin, Downs, Rachlin & Martin, St. Johnsbury, Vt., of counsel, for plaintiff-appellant.

Leslie W. Jacobs, Cleveland, Ohio, Charles L. Freed, Thompson, Hine & Flory, Cleveland, Ohio, Joseph E. Frank, Paul, Frank & Collins, Inc., Burlington, Vt., Francis D. Price, Jr., Syracuse, N. Y., of counsel, for defendants-appellees.

William F. Baxter, Asst. Atty. Gen., Robert B. Nicholson, George Edelstein, Dept. of Justice, Washington, D. C., of counsel, for amicus curiae United States.

Before FEINBERG, Chief Judge, MESKILL, Circuit Judge, and PALMIERI, District Judge.*

MESKILL, Circuit Judge:

Rehearing has been granted. The opinion filed on January 20, 1982, slip op. 883, is withdrawn and the following is substituted therefor.

Shop & Save Food Markets, Inc. (Shop & Save) appeals from a judgment of the United States District Court for the District of Vermont, Albert W. Coffrin, *Judge*, granting summary judgment for defendants Pneumo Corporation (Pneumo), Abbott Realty Company (Abbott) and P & C Food Markets, Inc. (P & C), in an action asserting violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 (1976).[1] For the reasons set forth below, we affirm the judgment of the district court.

I

Shop & Save, a Vermont corporation, operates retail grocery stores in St. Johnsbury, Derby and Lyndonville, Vermont. Pneumo, a Delaware corporation, owns or controls the other defendants: P & C, a New York corporation which operates a chain of retail grocery stores in New England; and Abbott, a Vermont corporation, which manages property for Pneumo. Pneumo acquired Abbott and Cross Compa-

---

* Hon. Edmund L. Palmieri, United States District Judge for the Southern District of New York, sitting by designation.

1. Although Shop & Save also asserted claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, and a claim under the Vermont Consumer Fraud Act, Vt.Stat.Ann. tit. 9 §§ 2451 *et seq.*, Shop & Save does not appeal from the grant of summary judgment for the defendants on these federal claims and the dismissal of the state claim.

ny (Cross), a wholesale grocery distributor, in 1972.

Prior to the events giving rise to this action, Shop & Save purchased virtually all of its groceries from Cross. From 1970 to 1977 Shop & Save subleased from Abbott the property where it operates its Lyndonville grocery store, paying a rental of $20,000 per year. Abbott's assets were transferred to P & C in 1977.

In July 1976, Shop & Save sought from Pneumo a long-term sublease with renewal options for the Lyndonville property. Thereafter, a protracted course of negotiations ensued, dictated in part by the parties' competing business considerations. During this time, Shop & Save began to purchase a portion of its wholesale groceries from a competitor of Cross. Further, correspondence between the parties indicated that P & C would be opening a competing grocery store in Lyndonville.

Initially, Pneumo responded to Shop & Save's request by offering to provide a long-term lease if Shop & Save agreed to continue to buy groceries from Cross. When Shop & Save refused to commit itself to purchases from Cross, Pneumo responded that it would not offer a lengthy sublease at the month-to-month rate because that figure was "far below" current "fair rental values." Pneumo stated that if it had to risk the loss of Shop & Save's wholesale purchases from Cross, it wanted "compensation." Pneumo repeated its offer to provide a long-term lease if Shop & Save agreed to continue its purchases from Cross.

On December 16, 1976, Shop & Save reiterated to Pneumo that it was unwilling to commit itself to any wholesale purchases from Cross. Pneumo responded on January 12, 1977, with an offer of a long-term sublease at $31,500 per year plus 1.5 percent of Shop & Save's annual sales above $1,500,000. Thereafter, several offers and coun-

teroffers were considered by the parties. Among these was an offer by Pneumo on January 24, 1977 that rent vary from $20,000 to $31,500 per year depending upon the amount of groceries purchased from Cross.[2] Shop & Save found the rental formula acceptable but was not satisfied with the lease term and renewal options. Accordingly, no final agreement was reached on the basis of the January 24 offer. Pneumo ultimately revoked its variable rent offer, and reiterated its "flat rent offer, which Shop & Save accepted on May 5, 1977.

On February 21, 1978, Shop & Save filed a complaint charging, *inter alia*,[3] that defendants had violated Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants moved for summary judgment on September 19, 1978. In opposing this motion, Shop & Save argued that it was forced to pay defendants a "penalty" rent for the Lyndonville property because it refused to purchase its wholesale groceries from Cross, and that defendants' conduct constituted a tying arrangement and a group boycott or concerted refusal to deal, all of which are *per se* unlawful.

The district court, on July 21, 1980, granted summary judgment for the defendants on Shop & Save's Section 1 Sherman Act claims. Judge Coffrin found that defendants' alleged conduct did not constitute a group boycott or a concerted refusal to deal because the only relevant conduct which Shop & Save "point[ed] to [was] P & C's determination to purchase wholesale groceries from Cross to the exclusion of other distributors. This [conduct] involved no other retailers—having failed to coerce [Shop & Save] to join—and we note that the Sherman Act does not prohibit individual companies from dealing exclusively with other individual companies." J.App. at 223. The district court found in the alternative that even if defendants had conspired to

2. Shop & Save alleged in its complaint that it had accepted Pneumo's January 24 offer but that in April 1977, before a sublease embodying these terms was signed, Pneumo revoked the offer. Shop & Save claimed that in the interim, it had purchased groceries from Cross with the understanding that the January 24 agreement

was in effect. However, Shop & Save alleges no injury from this conduct. Accordingly, we need not decide whether an unlawful tying arrangement existed during this period.

3. *See* note 1, *supra.*

coerce Shop & Save to agree not to purchase wholesale groceries from Cross' competitors, Shop & Save had failed to allege an injury that was causally related to a group boycott or concerted refusal to deal. The district court also found that the alleged conduct did not constitute an illegal tying arrangement because there was no agreement in existence that involved two products. Shop & Save had acquired a lease for the Lyndonville premises and was free to purchase its wholesale groceries from any supplier.

## II

The narrow issues presented on appeal are whether the district court erred in holding that defendants' alleged conduct did not constitute a *per se* illegal group boycott or concerted refusal to deal, or a *per se* illegal tying arrangement. For the reasons set forth in Judge Coffrin's thorough opinion, J.App. at 212–31, we affirm the grant of summary judgment on Shop & Save's group boycott or concerted refusal to deal claim. We also agree with the district court that defendants' alleged conduct does not constitute an illegal tying arrangement.

█ "[T]he vice of tying agreements lies in the use of economic power in [the tying] market to restrict competition on the merits in [the tied market]." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 11, 78 S.Ct. 514, 521, 2 L.Ed.2d 545 (1958); *see Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 605, 73 S.Ct. 872, 878, 97 L.Ed. 1277 (1953). Therefore, as the Supreme Court and this Circuit have held, to prove a tying violation a plaintiff must establish, *inter alia*, the existence of two separate and distinct products, *see Northern Pacific Railway Co. v. United States*, 356 U.S. at 5–6, 78 S.Ct. at 518–519; *Coniglio v. Highwood Services, Inc.*, 495 F.2d 1286, 1289 (2d Cir.), *cert. denied*, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974), that he was actually coerced by the seller into agreeing to buy the tied product, *Unijax, Inc. v. Champion International, Inc.*,

683 F.2d 678 (2d Cir. 1982); *Capital Temporaries, Inc. v. Olsten Corp.*, 506 F.2d 658, 662–63 (2d Cir. 1974); *Hill v. A–T–O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976), or at least into agreeing not to purchase the tied product from another, *Northern Pacific Railway Co. v. United States*, 356 U.S. at 5–6, 78 S.Ct. at 518–519, and that the illegal tying arrangement resulted in the actual foreclosure of competition in the tied product market, *id.* at 6, 78 S.Ct. at 519; *International Salt Co. v. United States*, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947); *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 58 (2d Cir. 1980); *Coniglio v. Highwood Services, Inc.*, 495 F.2d at 1292.

In this case, Shop & Save admits that no agreement was reached on Pneumo's January 24 offer which provided for a variable rent depending upon the level of Shop & Save's wholesale grocery purchases from Cross.[4] Shop & Save asserts, however, that it has been forced to pay a penalty rent for the Lyndonville property. Shop & Save alleges that Pneumo's exaction of this penalty rent constitutes an illegal tying arrangement. We disagree.

█ As stated above, a tying arrangement cannot exist unless the buyer was actually coerced by the seller into agreeing to buy the tied product or to refrain from purchasing the tied product from the seller's competitors. *Northern Pacific Railway Co. v. United States*, 356 U.S. at 5–6, 78 S.Ct. at 518–519; *Unijax, Inc. v. Champion International, Inc.*, 683 F.2d 678; *Capital Temporaries, Inc. v. Olsten Corp.*, 506 F.2d at 662–63; *Hill v. A–T–O, Inc.*, 535 F.2d at 1355. Absent this showing, there is lacking a definite nexus between the tying and the tied markets from which to conclude that the seller's exercise of economic power in the tying market will "always or almost always tend to restrict competition and decrease output," *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–1563, 60 L.Ed.2d 1 (1979), in the tied mar-

---

4. We express no opinion on whether an unlawful tying arrangement would have existed had an agreement been reached on the January 24 offer.

ket. For example, in the present case, even if Shop & Save has to pay a "penalty" for the tying product, Shop & Save is free to purchase and in fact admits that it does purchase its wholesale groceries from competitors of Cross. Accordingly, because the seller is unable to use his power or leverage in the tying market to deny his competitors free access to the tied market, *see Northern Pacific Railway Co. v. United States*, 356 U.S. at 6, 78 S.Ct. at 519, an attempt to force a tie which results only in an agreement to pay a higher price for the tying product is not a tying violation.[5]

In deciding whether to invoke the *per se* rule, we must be cognizant of the teachings of the Supreme Court that "easy labels do not always supply ready answers[,]" *Broadcast Music, Inc. v. CBS*, 441 U.S. at 8, 99 S.Ct. at 1556, and that "[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act[,]" *United States v. Topco Associates, Inc.*, 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133–1134, 31 L.Ed.2d 515 (1972). The alleged unlawful conduct in this case may well give rise to a cause of action. However, it does not constitute a *per se* illegal tying arrangement. Neither does it constitute a *per se* illegal group boycott or concerted refusal to deal, for the reasons spelled out in Judge Coffrin's opinion below, J.App. at 212-31.

Affirmed.

FEINBERG, Chief Judge, (concurring):

I concur in the result reached by the majority, but I would like to add a few words to recount the history of this case in this court.

The appeal was argued on October 9, 1981 and, by opinion dated January 20, 1982, a divided panel affirmed the district court on the group boycott and concerted refusal to deal issues, but reversed and remanded on the tying claim. The majority recognized that a penalty rent could have as strong an adverse effect on Shop & Save's ability to compete as a forced purchase of groceries from Cross. Accordingly, over a strong dissent by Judge Meskill, we held that a penalty rent should be treated as the equivalent of a tie-in and should be condemned if the trial court found that the other factors for finding a tying violation were present. There then occurred the rare event of a successful petition for rehearing.

The tie-in field, like much of antitrust law, rests on certain economic assumptions that are coming under increased scrutiny, see, e.g., R. Bork, The Antitrust Paradox 365–81 (1978). I concur in the changed result reached by the new majority because I agree that in view of the present case law and the current learning, it would be unjustifiable to extend the law regarding tying to the fact pattern presented here. Penalties exacted for the privilege of buying one product rather than two have been mentioned tangentially at least twice before, and on neither occasion was the practice condemned under the antitrust laws, see *International Business Machines Corp. v. United States*, 298 U.S. 131, 134 & 139, 56 S.Ct. 701, 703 & 705, 80 L.Ed. 1085 (1936) (15% increase in rental for release from condition that lessee buy tabulating cards only from lessor); *SmithKline Corp. v. Eli Lilly & Co.*, 427 F.Supp. 1089, 1110–14 (E.D. Pa.1976), aff'd on other grounds, 575 F.2d 1056, 1061 & n.3 (3d Cir.), cert. denied, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978) (loss of 3% bonus rebate for failure to buy minimum amounts of three products). But cf. *United States v. Loew's, Inc.*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962) (remedial decree forbade non-cost-justified differential between cost of single film and pack-

---

5. As stated by this Court:

Tying arrangements are abhorred by the courts primarily because they foreclose a substantial quantity of business to competitors and extend preexisting economic power to new markets for no good justification .... Foreclosure implies actual exertion of economic muscle, not a mere statement of bar-

gaining terms which, if they should be enforced by market power, would then incorporate an illegal tie.

*American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.*, 446 F.2d 1131, 1137 (2d Cir. 1971) (citation omitted), *cert. denied*, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972).

age. But this relief cannot, under our decision in *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.*, 446 F.2d 1131, 1136–37 (2d Cir. 1971), cert. denied, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972), be relied on to determine the elements necessary to prove an illegal tie). I therefore agree with the district court and with the majority in the conclusion that there was no antitrust violation in this case.